In the Matter of CLIFFORD RANDALL, by His Attorney, MICHAEL HANDWERKER, Petitioner, v HAROLD ROTHWAX, as Justice of the Supreme Court of the State of New York, et al., Respondents.

First Department, September 6, 1990

APPEARANCES OF COUNSEL

*Michael Handwerker* for petitioner.

*Brian E. O'Donoghue* of counsel *(Robert M. Morgenthau, District Attorney,* attorney), respondent *pro se.*

## OPINION OF THE COURT

MURPHY, P. J.

Petitioner in this proceeding brought pursuant to CPLR article 78 seeks to prohibit the New York County District Attorney from reprosecuting him upon indictment number 2495/89. He claims that reprosecution will violate his constitutional right not to be twice placed in jeopardy of conviction for the same crime. The unique circumstances giving rise to petitioner's claim are as follows:

Petitioner was charged in indictment number 2495/89 with attempted murder in the second degree and related crimes. His trial commenced on June 13, 1989 before Justice Rothwax. On June 20, 1989 the case was put to the jury at about 12:00 noon. At about 2:15 P.M. the jury received a read back of certain testimony. Thereafter, the members of the jury deliberated until 6:00 P.M. when they were sent for dinner. When the jurors had finished their dinner they resumed deliberating until 7:55 *p.m.* at which time they sent the court a note indicating that they were deadlocked. The court then gave the jury a mild *Allen* charge and instructed the jurors to continue deliberating. Either immediately before or after the *Allen* charge, the court addressed the defendant and his counsel in the presence of the prosecutor. He told them that he had "reliable" information that the jury was divided 10 to 2 in favor of conviction. Although the court cautioned that it was not entirely sure of this "reliable" information, he named the two jurors whom he believed were leaning in favor of acquittal. The court expressed the view that it would be a long night and suggested that the parties might want to talk about a plea. Thereafter, the 17-year-old defendant conferred with his attorney. His attorney advised him that there was a possibility that the two jurors for acquittal would be pressured into changing their positions and voting for conviction on the attempted murder count. Counsel, however, thought it more likely that the jury would either remain deadlocked or would compromise and convict the defendant of the second count in the indictment, assault in the first degree, for which the defendant would probably receive a sentence of 7½ to 15

years. The defendant was advised that the jury might return with a verdict at any time thus foreclosing the possibility of obtaining a more lenient sentence by means of plea bargain. Believing, on the basis of the information imparted by the court, that there was little or no chance of an acquittal and that a verdict entailing a stiff sentence might be imminent, the defendant, although protesting his innocence, agreed, in full satisfaction of the indictment, to enter a plea of guilty to the third count, criminal use of a firearm in the first degree, in exchange for a promised sentence of from 4¼ to 8½ years. The plea bargain was readily approved by Justice Rothwax who, although unwilling to accept an *Alford* plea, offered the defendant a "painless allocution".

Shortly after the jury had been discharged, it came to light that the jury had, in fact, been leaning 10 to 2 in favor of acquittal. The jury foreperson stated in an affidavit that just after dinner on June 20, 1989 she recorded an informal vote of the jury in which 10 voted to acquit and 2 to convict. A second juror has filed an affidavit confirming the foreperson's and noting further: "Just prior to our receiving instructions to cease deliberations because we were being discharged, we were meditating and searching our inner selves. The overwhelming sentiment was for acquittal. It is my strong conviction that had the court allowed us to deliberate another 10 minutes that the defendant would have been acquitted on all charges."

On June 22, 1989 the defendant moved to withdraw his plea claiming that he had been induced to enter a plea based upon improperly conveyed and inaccurate information. Justice Rothwax granted the motion, stating, "I feel as an act of discretion that the motion to withdraw the plea should be granted since it appears to me that the defendant and his Counsel may have been misled, inadvertent to be sure, but misled by the Court nevertheless."

Following the plea withdrawal, the defendant retained new counsel who, on October 26, 1989, moved to preclude retrial of the defendant on double jeopardy and due process grounds. In his decision denying the motion, Justice Rothwax first noted that he did not dispute defendant's account of what had occurred leading to the termination of the trial. He acknowledged that it had been "ill-advised" for him to discuss the status of the jury's deliberations with the defendant, but stated that he had done so because he thought the information would be "helpful" and "useful" to the defendant. The information respecting the jury's progress, Justice Rothwax

explained, came to him from a court officer. The Judge had inquired of the court officer how things had gone at dinner and the court officer in response volunteered that everything had gone well except that the jury seemed split into two factions—a group of 10 to convict and a group of 2 to acquit. According to Justice Rothwax, the court officer had not spoken to the jurors but had gathered the existence and dimensions of the split from observing the way the jurors sat and interacted during dinner. Justice Rothwax acknowledged that the defendant had relied upon the erroneous information imparted by him in determining to enter his plea, but nevertheless concluded that there existed no basis to sustain the double jeopardy claim.

Upon the denial of his motion, the defendant commenced the within proceeding in which he renews his contention that reprosecution will violate the constitutional injunction against double jeopardy. The People have replied that in the absence of judicial or prosecutorial acts designed to avoid an acquittal, reprosecution ought not to be barred.

Our Federal and State Constitutions both provide in substance that the government may not place a criminal defendant twice in jeopardy for the same offense (US Const 5th Amend; NY Const, art I, § 6). The protection, an ancient one deeply rooted in the common law *(see, e.g.,* 4 Blackstone's Commentaries, at 335; *Regina v Tancock,* 13 Cox Crim Cas 217, 220; *King v Emden,* 9 East 437, 445-447), has been thought an essential check upon the power of the State to intimidate its citizenry *(People v Michael,* 48 NY2d 1, 7). It is recognized that the State possesses prosecutorial resources far in excess of those the individual may marshall for his or her defense, and that if the State is permitted to reprosecute an individual without limitation it may achieve through attrition an advantage having nothing to do with the merits of its case *(see, Green v United States,* 355 US 184, 187-188). Indeed, a prosecution exacts a tremendous personal, economic and social toll upon a defendant, which, although necessary in the first instance, cannot be lightly permitted anew, for to do so would be to permit a form of punishment not only unsanctioned by, but abusive of, judicial process *(supra).* Ordinarily, then, the prosecution gets but one opportunity to prove its case against a criminal defendant. Concomitant with this limitation is the "valued right" of the defendant to have his case completed in one proceeding before the particular jury he has participated in selecting *(Wade v Hunter,* 336 US 684, 689).

Notwithstanding the language of the Federal and State double jeopardy provisions which literally read would seem to constitute absolute bars to reprosecution, it is by now well established that a defendant whose judgment of conviction is reversed on appeal may be reprosecuted *(see, United States v Ball,* 163 US 662), except in those instances where the reversal is predicated upon evidentiary insufficiency *(see, Burks v United States,* 437 US 1). The defendant is said to consent to reprosecution when he or she challenges the judgment of conviction. Similarly, the defendant is deemed to consent to reprosecution when he or she moves for or acquiesces in the declaration of a mistrial. In both situations the defendant's request for relief is construed as a request for adjudication in a forum free from prejudicial taint. Where, however, a defendant has not sought to void or avoid a judgment, it is clear that no consent to reprosecution can be inferred.

By entering a guilty plea, of course, the defendant did not seek to avoid a judgment of conviction. To the contrary, he consented to one being entered against him because he wished conclusively to terminate his jeopardy at that point on terms he believed to be the most favorable he could obtain. Obviously, no consent to reprosecution can be inferred from an action so unequivocally intended to bring the prosecution to a definitive end. The defendant has, however, since moved to withdraw his plea and so to avoid the judgment which would have been entered thereon. What significance is to be attached to this action?

It would seem to us that this would depend upon the circumstances under which the plea was originally entered. If the plea was voluntary and therefore entailed a knowing and intelligent waiver of the defendant's right to have his case decided by the first impaneled jury, the withdrawal of the plea, permitted as a matter of discretion, would in no way affect the validity of the waiver. Where, however, the plea was coerced and the waiver of the defendant's right to proceed before the first tribunal was therefore vitiated, we can perceive no basis for characterizing the motion to withdraw the plea as a consent to reprosecution. To conclude otherwise would be to say in effect that a defendant may only vindicate one constitutional right—the right not to be convicted upon a coerced plea—at the expense of another constitutional right— the right not to be twice placed in jeopardy. We do not think that any such perverse economy of rights may be countenanced, for as Justice Holmes stated "it cannot be imagined

that the law would deny to a prisoner the correction of a fatal error, unless he should waive other rights so important as to be saved by an express clause in the Constitution of the United States" *(Kepner v United States,* 195 US 100, 135 [dissenting opn]; *accord, Green v United States,* 355 US 184, 192-194).

The question then upon which the determination of this proceeding substantially depends is whether the defendant's plea was in fact coerced and the waiver of his right to have his case decided by the first impaneled jury therefore vitiated.

A review of the record leaves us with no doubt that the defendant's guilty plea was coerced, perhaps inadvertently, but coerced nonetheless. Realistically, the trial court's inexplicable announcement* to the 17-year-old defendant that the jury was leaning 10 to 2 in favor of conviction left the defendant with no option but rapidly to enter a plea, for based upon what the Judge had told him, the defendant quite reasonably believed that the jury was poised to convict him of one of the indictment's top counts and that it might do so at any time. From the defendant's perspective, the entry of a plea was the only way to avoid spending the remainder of his youth in prison. We cannot conceive that any similarly situated defendant would have acted differently.

Of course, the fact that the defendant perceived his options to be severely limited, would not of itself require the conclusion that the plea was coerced. Guilty pleas are almost always the product of a defendant's understanding that his options are very narrowly circumscribed. What distinguishes the present plea is that it was prompted by a grossly inaccurate and inappropriate representation which prevented the defendant

---

* It is, of course, very basic that jury deliberations are to be conducted in absolute secrecy and, accordingly, that the status of those deliberations is not to be divulged by anyone, most particularly agents of the court, prior to the announcement of the verdict. As the Court of Appeals has stated, "[t]he strong public policy favoring the absolute confidentiality of jury deliberations is not lightly to be disregarded" *(People v Bouton,* 50 NY2d 130, 138; *see also,* CPL 310.10). While we do not conclude on the record before us that there was improper communication between the jury and the court, the possibility cannot be discounted, for we can think of no reason why an experienced Trial Judge would represent as "reliable" information which was, in reality, wholly speculative. If the sole basis for the Judge's announcement was the court officer's observation of the way the jurors sat and interacted at dinner, the characterization of the information given the defendant as "reliable" was, if anything, almost as remarkable as the Judge's determination to make any disclosure at all.

from any intelligent assessment of his real options. At the heart of the defendant's decision to plead not guilty lay the conviction that the particular jury chosen to hear his case would view his cause favorably. The defendant, who always had the option to enter a plea, remained content, in light of his assessment of the merits of his case, to have his fate decided by that jury and indeed there is every indication that the defendant, satisfied with the way the trial had gone, would have left his case with the jury had the court not led him to believe that his confidence in the jury was seriously misplaced. What had seemed the defendant's most attractive option now seemed, in view of the court's completely erroneous disclosure, one fraught with prohibitive risks. The defendant then determined to remove his case from the jury based upon a critical misperception of the risks entailed by his original election, a misperception fostered entirely by the Trial Judge's singularly improvident announcement. We cannot say that a plea entered in such circumstances was intelligently made. We think it clear that a plea induced by materially false information imparted by a Trial Judge, has been coerced and cannot be permitted to stand and, accordingly, that the vacatur of defendant's plea was required as a matter of law (see, People v Jones, 63 AD2d 1008).

Having so concluded, it follows that the defendant's motion to withdraw his plea cannot be viewed as a consent to reprosecution. Indeed, the injury the defendant has suffered as a result of the trial court's highly improvident disclosure is not one which a new trial might cure. The defendant does not claim that his cause was prejudiced by the manner in which his trial was conducted. He does not claim that evidentiary errors or an erroneous charge set the jury inalterably against him so that his fate can now be fairly determined only by a new fact finder. His claim is quite the opposite. He maintains that he was sufficiently satisfied with the way his trial had gone to leave the case with the jury and that he would have done so had the Judge's grossly inaccurate and improper announcement respecting the jury's disposition to convict not induced him to enter a plea. The defendant then does not seek a new chance for acquittal; if he could, he would have his old chance of acquittal—which by all accounts was excellent—back. But as that chance has been irretrievably lost through no fault of his own, the defendant merely seeks to assert his right under the Constitution to avoid further jeopardy. As we can perceive no point at which that right may be fairly said to

have been relinquished by the defendant, we believe that the within petition must be granted.

In reaching this conclusion, it is important to note that there are circumstances in which a defendant may be retried notwithstanding his lack of consent to the premature termination of his first trial. Retrial in the absence of consent by the defendant to the prior termination is, however, sharply limited to those cases in which the termination of the first proceeding was dictated by manifest necessity *(United States v Perez,* 9 Wheat [22 US] 570). We can conceive of no case in which it would be manifestly necessary for a Trial Judge to coerce a guilty plea from a defendant. Far from being necessary, such conduct is clearly contrary to the ends of public justice.

We are, of course, aware that in *United States v Tateo* (377 US 463) the Supreme Court, upon facts in many respects similar to those at bar, held that reprosecution was not foreclosed by the Double Jeopardy Clause of the US Constitution. In *Tateo,* a guilty plea was obtained on the fourth day of trial after the trial court threatened that, if the defendant persisted in exercising his option to proceed with his trial, and was convicted, he would be sentenced to life imprisonment without possibility of parole. The defendant's plea was subsequently set aside by Judge Weinfeld who found it to have been coerced. Thereafter, reprosecution was barred by Judge Tyler on the ground that neither constitutionally sound consent nor an exceptional circumstance supported the termination of the first trial. A divided Supreme Court reversed, holding, in essence, that in the absence of any intimation that the plea had been coerced to avoid a verdict of acquittal, the coercion of the plea was no different from any other error warranting reversal on appeal. The court stated, "[i]t would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction" *(supra,* at 466).

Respectfully, however, we do not think that the coercion of a guilty plea by a Trial Judge after jeopardy has attached can be considered just "any defect sufficient to constitute reversible error". In contrast to other kinds of trial errors which, even if prejudicial, leave the defendant with the option of continuing the trial in order to obtain a verdict of acquittal, the coercion of a guilty plea by the Trial Judge completely abrogates that option, and so, defeats the valued right of the

defendant to obtain a verdict in one proceeding from the first impaneled jury. It is precisely this right that the Double Jeopardy Clause is intended to safeguard and we know of no constitutionally founded principle which would deny a defendant its protection in the circumstances here presented. While we recognize the strong societal interest in seeing the guilty punished, and understand the tension between that interest and the Constitution's unqualified injunction against double jeopardy, we think that the interests of society are sufficiently protected by the rule enunciated in *Ball* (163 US 662, *supra*). The vindication of society's legitimate interest does not, in our view, require the further limitation of constitutional rights apparently sanctioned in *Tateo (supra)* and which the People propose here.

In any event, we think it difficult to square *Tateo (supra)* with prior decisions of the Supreme Court such as *Downum v United States* (372 US 734) and *Green v United States* (355 US 184), which decisions *Tateo* does not purport to disturb. Nor do we find it easy to reconcile *Tateo* with subsequent Supreme Court doctrine indicating that "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of [judicial or prosecutorial] error" *(United States v Dinitz,* 424 US 600, 609); for, manifestly, where a plea has been coerced, and particularly where, as here, it has been coerced by highly material factual misrepresentations, the defendant has been deprived of all control over the course to be followed.

The difficulty with the holding in *Tateo (supra)* is nowhere brought into sharper focus than in *United States v Jorn* (400 US 470). In *Jorn,* Justice Harlan, who had also authored *Tateo,* observed much as we have here: "the crucial difference between reprosecution after appeal by the defendant and reprosecution after a *sua sponte* judicial mistrial declaration is that in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal. *On the other hand, where the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal.' "* *(Supra,* at 484 [emphasis added].) Recognizing the very apparent conflict between this unexceptionable acknowledgment of the defendant's very substantial interest in retaining the option to have his case decided by the first tribunal, and the

statement in *Tateo* that "[a] defendant is no less wronged by a jury finding of guilt after an unfair trial than by a failure to get a jury verdict at all" *(United States v Tateo, supra,* 377 US, at 467), Justice Harlan attempted to harmonize his views as follows: "even though defendant's guilty plea [in *Tateo]* which aborted the trial was subsequently held to have been coerced by judicial action, the defendant nonetheless was not foreclosed of his option to go to the jury if he chose to do so, and thereafter rely on post-conviction proceedings to redress the wrong done to him by the judge. In other words, the question of 'voluntariness' for purposes of assessing the validity of a plea of guilty—whether offered before or at trial— must be distinguished from the question of 'voluntariness' for purposes of assessing reprosecutability under the Double Jeopardy Clause." *(United States v Jorn, supra,* at 484-485, n 11.) That this is not a tenable distinction seems to us clear. The entry of a plea of guilty and loss of the right to proceed before the first jury, are inextricably bound together. If the plea has not been voluntary, we are completely at a loss to understand how the defendant may be said to have still retained some meaningful option to go to the jury.

Assuming, however, that the distinction is more than merely semantic, and that there are situations in which a defendant coerced to end his trial with a plea can nevertheless be said to have retained his option to proceed, and assuming further that *Tateo (supra)* was such a case, we think that the facts at bar present a situation in which the option to proceed was so thoroughly eclipsed as to make the termination of the trial involuntary, even "for purposes of assessing reprosecutability under the Double Jeopardy Clause."

Although the Trial Judge's threat in *Tateo (supra)* was highly coercive, it could not have affected Tateo's assessment of his chance for acquittal. In a sense then Tateo's option to go to the jury may be said to have survived the Judge's threat, for while the consequences of a conviction were made to seem severe indeed, the defendant, arguably, might still have chosen to submit his case to the jury had he had sufficient confidence in its merits. By contrast, in the matter at bar, the Judge's misrepresentation led the defendant to believe that he could no longer trust the jury with his fate no matter how convinced he was of his innocence and the merits of his defense. If the option to go to the jury has any value, it is because the jury has the power to acquit. When a Trial Judge by patently improper announcement of the jury's leanings

leads a defendant to believe that a jury will exercise its power to convict rather than acquit, he cannot but destroy whatever value the jury option possesses for the defendant. That is precisely what occurred in the matter at bar. That a defendant's option to go to the jury should be vitiated in such a fashion would be disturbing in any case, but it is particularly so here where the value of the voided option was apparently very substantial.

In view of our factual determination that the defendant was completely deprived of his option to go to the jury, we find no merit to the People's argument that the success of the defendant's double jeopardy claim depends on whether there was some governmental design to provoke the plea so as to avoid a verdict of acquittal. The cases in which the intent of either the Judge or prosecutor becomes relevant to the disposition of double jeopardy claims are, without exception, cases in which the defendant has been left with some option to go forward with his trial. Most typically, these are situations in which a mistrial has been declared on the defendant's motion as a result of either judicial or prosecutorial error. It is recognized that, in such circumstances, although the defendant is left with a most unhappy choice, the choice of whether to proceed is still his; cognizant of the error which has been made and its probable impact on his chances with the jury, the defendant may intelligently elect either to continue his trial or to seek to abort the tainted proceeding in order to obtain a fresh chance for acquittal—one which may be afforded without the delay necessitated by intervening appellate proceedings. The existence of this option, while hardly optimal for the defendant, has been held sufficient to defeat most double jeopardy claims *(United States v Dinitz,* 424 US 600, 606-609). The reason for this is fundamentally that the social price of barring reprosecution in all cases where government error or even overreaching has provoked the defendant to move successfully for a mistrial would be too high. It is, however, clear that there is a point at which there must be some effective sanction for governmental overreaching resulting in multiple prosecutions. The line, at least on the Federal Level, has been drawn at governmental actions specifically intended to goad the defendant into requesting a mistrial declaration *(Oregon v Kennedy,* 456 US 667, 675-676). But the focus on the prosecutor's or Judge's intent is relevant only in situations where some option remains with the defendant and he may therefore be said to have in some sense consented to the termination of

his trial. Where, as here, the defendant is so thoroughly deprived of any basis for reasonably assessing his chances with the jury that his option has, by any realistic measure, been entirely extinguished, the situation is not so much akin to that presented by a mistrial declared on the defendant's motion, as it is to a mistrial declared by the court on its own initiative. And, as noted, when a mistrial is declared, *sua sponte,* by the court, the single relevant inquiry has nothing to do with judicial or prosecutorial intent but is concerned solely with whether the court's determination to end the trial was manifestly necessary. As we have already had occasion to observe, there was nothing even remotely necessary about the judicial conduct which caused the termination of the defendant's trial.

While we think, in view of the preceding discussion, that the matter at bar is distinguishable from *Tateo (supra),* we are left with the most serious doubts as to whether the availability of a constitutional right as fundamental as the right not to be twice tried for the same offense, ought to depend upon the sort of distinctions made relevant by *Tateo.* We would have thought that once it had been factually determined, as it was in *Tateo,* that a defendant had been "enveloped by a coercive force * * * which, under all the circumstances, foreclosed a reasoned choice by him at the time he entered his plea" *(United States v Tateo,* 214 F Supp 560, 568 [Weinfeld, J.]), there would be no possibility of sensibly concluding that the surrender of the right to go to the first jury had been voluntary. Thus, even if it were not possible to distinguish *Tateo,* as we have, we would still determine to bar reprosecution of the defendant, premising our ruling upon the independent protections against double jeopardy found in our State Constitution.

Accordingly, the petition should be granted, the respondents prohibited from any further prosecution of the petitioner under indictment number 2495/89 and the indictment dismissed, without costs.

SULLIVAN, CARRO, WALLACH and RUBIN, JJ., concur.

Application in the nature of a writ of prohibition granted, the respondents prohibited from any further prosecution of the petitioner under indictment number 2495/89, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused

pursuant to CPLR 160.50, not less than 30 days after service of this order upon the respondents, with leave during this 30-day period to respondents to move and seek any further stay of the implementation of CPL 160.50 as in the interest of judgment is required.